COULEE CATHOLIC SCHOOLS,
Petitioner-Appellant-Petitioner,

v.

LABOR AND INDUSTRY REVIEW COMMISSION,
Department of Workforce Development
and Wendy Ostlund,
Respondents-Respondents.

Supreme Court

*No. 2007AP496. Oral argument March 3, 2009.
—Decided July 21, 2009.*

2009 WI 88

(Also reported in 768 N.W.2d 868.)

For the petitioner-appellant-petitioner there were briefs by *James G. Birnbaum, Ross A. Seymour, Jessica T. Kirchner,* and *Birnhaum, Seymour, Kirchner & Birnbaum, LLP,* La Crosse, and oral argument by *James G. Birnbaum.*

For the respondent-respondent, Labor and Industry Review Commission, the cause was argued by *David C. Rice,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

For the respondent-respondent, Wendy Ostlund, there was a brief by *Dawn Marie Harris* and *D.M. Harris Law, L.L.C.,* La Crosse, and oral argument by *Dawn Marie Harris.*

¶ 1. MICHAEL J. GABLEMAN, J. Wendy Ostlund ("Ostlund") brought a claim alleging that she was terminated from her first-grade teaching position at a Catholic school on the basis of her age in violation of the Wisconsin Fair Employment Act ("WFEA"). The school responded that her position was "ministerial," maintaining therefore, that her suit was barred by the First Amendment of the United States Constitution. The La Crosse County Circuit Court, Dale T. Pasell, Judge, determined that her position was not ministerial. In a

published decision,[1] the court of appeals affirmed the judgment of the circuit court.

¶ 2. The question before us is whether Ostlund's age discrimination claim under the WFEA is precluded by the First Amendment and/or the Freedom of Conscience Clauses in Article I, Section 18 of the Wisconsin Constitution.

¶ 3. We conclude that both the Free Exercise Clause of the First Amendment of the United States Constitution and the Freedom of Conscience Clauses in Article I, Section 18 of the Wisconsin Constitution preclude employment discrimination claims under §§ 111.31 to 111.395 of the Wisconsin Fair Employment Act for employees whose positions are important and closely linked to the religious mission of a religious organization. In the case at bar, Ostlund's school was committed to a religious mission—the inculcation of the Catholic faith and worldview—and Ostlund's position was important and closely linked to that mission. Therefore, Ostlund's age discrimination claim under the WFEA unconstitutionally impinges upon her employer's right to religious freedom. Accordingly, we reverse the court of appeals' decision and remand to the circuit court to dismiss Ostlund's claim.

## I. FACTS

¶ 4. Wendy Ostlund began working as a first-grade teacher at St. Patrick's Elementary School, a Catholic school located in Onalaska, Wisconsin, in 1974. St. Patrick's is a member school of Coulee Catholic Schools ("CCS"), which is a cooperative effort between

---

[1] *Coulee Catholic Schs. v. Labor & Indus. Review Comm'n, Dep't of Workforce Dev.*, 2008 WI App 68, 312 Wis. 2d 331, 752 N.W.2d 341.

area Catholic schools to share resources, streamline administration, and unify curriculum. CCS is owned, operated, and subject to the authority of the Diocese of La Crosse, Wisconsin, and is therefore an entity of the Catholic Church. In 2003, CCS consisted of one high school, one middle school, five primary/elementary schools, and one early childhood center.

¶ 5. The Catholic school is considered a "ministry" of the Catholic Church. According to documents submitted in the course of this litigation, the Catholic Church considers "the foundation of the whole educational enterprise in a Catholic school" to be Jesus Christ. The Catholic school aims at "a Christian concept of life centered on Jesus Christ." Teachers are believed to be essential to this ministry. As Archbishop Emeritus of St. Louis, Raymond L. Burke, the Bishop of La Crosse at the time of Ostlund's termination, testified in his deposition:

> [I]t's the teachers who make the Catholic school happen. In other words, the students first learn the integration of faith and culture, the integration of faith and learning the practice of their faith from their active learning from the witness that their teachers give. And to teach a Catholic spirit, a Christian spirit in a whole school, the teachers have to reflect this, first of all, in their own lives.

¶ 6. During her tenure with CCS, Ostlund's typical school day would run from approximately 7:30 a.m. until 3:30 p.m. Before students arrived, Ostlund would finish preparations for the day, including finalizing her lesson plans. After students arrived, Ostlund began the day with prayer and the Pledge of Allegiance.

¶ 7. The first subject of the day was reading. After reading, students had recess, followed by either computer instruction or art class. Both of these were taught

by another teacher. Ostlund would then teach science and social studies on alternating days. Her social studies instruction contained a Christmas unit during which Ostlund had the students make a booklet that discussed ways other countries celebrate Christmas.

¶ 8. After this, students had lunch, followed by recess. Ostlund did not supervise lunch, but did sometimes go out to the playground with the students. Following lunch, Ostlund again led the students in prayer. The afternoon schedule consisted of math and handwriting. The students then went to physical education or music class, which were taught by another teacher.

¶ 9. During this more traditional academic curriculum, Ostlund made efforts to incorporate religious examples, symbols, and values into the lessons. For example, in a reading exercise involving word recognition that required students to match colors with corresponding numbers on a worksheet, the colors corresponded to different objects in the Garden of Eden. Or in math, some of the exercises involved worksheets where students connected dots that formed religious images.

¶ 10. The final period of the day was religion, which usually lasted thirty minutes. Ostlund taught religion on her own three days per week. A priest or deacon accompanied Ostlund on the fourth day. During religion class, Ostlund taught the Catholic faith, not comparative religion. Ostlund taught her students about prayer, and was often the first person to teach the first graders certain Catholic prayers. She taught them basic Catholic doctrine, and specific worship practices like the Stations of the Cross. Ostlund also helped her students

celebrate school-wide religious holidays such as St. Patrick's Day, Advent,[2] May crowning,[3] and Lent.[4]

¶ 11. On the fifth day of the week, Ostlund attended a school-wide Mass with her students. Approximately every fourth week, Ostlund was responsible for helping to plan the Mass with her class. When planning Mass, Ostlund was in charge of choosing appropriate readings from the Bible. She was also responsible for the petitions that would be read and prayed during Mass. These she would either choose from a liturgy guide, or at times, write herself. Ostlund also participated in various aspects of the Mass, including reading responsorial psalms and carrying the bread and wine. Thus, Ostlund played an important role in planning the all-school Mass and in teaching her students about the Mass—one of the central acts of worship in the Catholic faith.

¶ 12. In addition to these specific duties, Ostlund's classroom incorporated objects of the Catholic faith into the learning environment, such as a crucifix and statue of Mary. The classroom had a prayer corner where the Bible, a rosary, and religious candles were displayed. She also incorporated certain seasonal displays such as palm leaves around Palm Sunday and a nativity scene during Christmas.

---

[2] During the Christmas season, Ostlund put up a nativity scene, and celebrated Advent with the traditional wreath.

[3] May crowning is a day of devotion to Mary when a statue of Mary is ceremonially crowned. *See* http://campus.udayton.edu/ mary//meditations/crowned.html. On that day, Ostlund would lead her children in crowning a statue of Mary.

[4] During Lent, Ostlund facilitated the giving up of some activity or food (beginning on Ash Wednesday), displayed palms in her class during Holy Week, and had her students collect money for Catholic missions.

¶ 13. Each year, Ostlund was required to sign an employment contract, which provided in pertinent part:

> The Employee agrees to faithfully and conscientiously perform any and all duties of the position(s) for which he/she is hired and all other duties as directed by the Employer including, but not limited to . . . comply[ing] with the requirements of the Diocese of La Crosse and the State of Wisconsin regarding the educational preparation of teachers.

It also provided:

> The Employee as a teacher in a Catholic educational system agrees that as a condition of employment he/she will support and exemplify in conduct both Catholic doctrine and morality. He/She must be consistent in expression and example, with the teaching and practice of the Catholic faith and shall not teach, advocate, encourage or counsel beliefs or practices contrary to the Catholic faith.

¶ 14. The CCS Faculty and Staff Handbook included written rules, regulations, and policies adopted by the Diocese of La Crosse and approved by its Bishop. These policies required teachers to comply with certain standards. A preamble to these standards stated in pertinent part:

> The primary mission of the Catholic Church is to continue the mission of Jesus: PROCLAIMING THE KINGDOM OF GOD. Central to this mission is the teaching of the Word of God. This ministry of the Word is given expression in the education efforts of the Church.

> It is the *goal* of the five dioceses in the state of Wisconsin to promote and support a comprehensive educational ministry. The ministry extends to people of all ages: adults, youth and children.

287

Following their long *tradition* of service to the people of Wisconsin, Catholic elementary and secondary schools and religious education programs continue to be an essential part of the educational ministry of the Church.

By virtue of their ministry, *personnel* in Catholic education are role models for other adults, youth and children. Therefore, they are called to be well-informed in Catholic teachings and committed to a Catholic way of life.

¶ 15. The standards themselves contain several requirements for teachers. Notably, elementary school teachers of religion were required to have both basic and advanced certifications in religion, which Ostlund acquired and maintained. Both the basic and advanced certifications involved yearly continuing education sessions where Ostlund was instructed on how to teach Catholic principles and doctrine.

¶ 16. Teachers were also required to "have appropriate certification with the Department of Public Instruction." Ostlund had a Bachelor of Science degree in physical education, but was not a licensed teacher. She was working to obtain her teaching license, however, which at some point had become a new requirement for CCS elementary school teachers.

¶ 17. Additionally, the standards required teachers of religion to be "Catholics who have admission to the full sacramental life of the Church and are engaged in the community of the faithful." However, the reviewing agency in this case concluded that, as a matter of practice, CCS did not require elementary school teachers to be members of a religious order or members of the Catholic Church. As discussed below, we defer to this finding as long as it is substantially supported by

288

the record, which it appears to be. Ostlund herself was Catholic and a member of St. Patrick's parish.

¶ 18. CCS provided a formal job description to Ostlund, which she signed.[5] The job description also served as a template for her yearly performance evaluation. Ostlund had six main areas of responsibility, broadly categorized as: (1) providing a "Religious Atmosphere," (2) "Teaching Responsibilities," (3) "Supervising Responsibilities," (4) "Professional" duties, (5) "Grade Level Responsibilities," and (6) complying "with all areas addressed in the contract and policies of the Diocese of La Crosse."

¶ 19. The "Religious Atmosphere" component contained the following standards:

A. Provide a good Christian model and example in one's attitudes and actions.

B. Encourage spiritual growth in students by developing inner discipline, character, morals, and values.

C. Provide leadership in living and celebrating life and liturgies.

¶ 20. Her "Professional" duties required her to, among other things, "Earn and maintain Religious Certification."

¶ 21. As part of her yearly evaluation, Ostlund and a supervisor commented on various aspects of her job performance as outlined in her job description. Some of Ostlund's comments regarding the "Religious Atmosphere" component of her job duties are relevant here. In her 1997 job evaluation, Ostlund stated: "When I teach prayer or religion class, attend or prepare liturgy or talk about morals and values, I know that I

---

[5] The last record of her signing was on August 30, 2000.

am dealing with things that are not found in a public school." With regard to her teaching technique, Ostlund commented in that same evaluation: "I am able to incorporate Catholic values into all of the subjects that I teach." In her 2001 job evaluation, she commented: "I encourage spiritual growth during religion class as well as throughout the day." In her 2002 evaluation, Ostlund stated: "I have taught religion daily and prepared liturgies, which are well thought out and appropriate for first graders." Ostlund's evaluator stated that Ostlund "prepares students for participation in liturgies and prayer services celebrated during the school year."

¶ 22. In the spring of 2002, CCS closed one of its elementary schools due to low enrollment. This required the school system to lay off several teachers. On March 27, 2002, Ostlund received a letter from the president of CCS stating that, due to the staff reductions, Ostlund would not be offered a contract for the 2002–03 school year. She was one of ten teachers not to receive contract extensions from CCS.[6] Ostlund was age 53 when she was terminated, and was replaced with a 35–year-old teacher who was certified to teach elementary school.[7]

## II. PROCEDURAL HISTORY

¶ 23. Following her termination, Ostlund filed an age discrimination complaint with the Equal Rights Division of the Wisconsin Department of Workforce

---

[6] Of the ten teachers who did not receive contract extensions, six were over age 40 and four were under age 40.

[7] At the time of her termination, Ostlund had not completed her state teaching certification, though she was working on it. After her termination, all of the remaining teachers at St. Patrick's were certified to teach elementary school.

Development ("Equal Rights Division"). Ostlund alleged that CCS terminated her because of her age in violation of the WFEA, Wis. Stat. §§ 111.31 to 111.395[8]

---

[8] The WFEA prohibits employers from denying employment to individuals on the basis of certain enumerated grounds. Relevant provisions are as follows:

Wis. Stat. § 111.31 Declaration of Policy

(1) The legislature finds that the practice of unfair discrimination in employment against properly qualified individuals by reason of their age, race, creed, color, disability, marital status, sex, national origin, ancestry, sexual orientation, arrest record, conviction record, military service, or use or nonuse of lawful products off the employer's premises during nonworking hours, substantially and adversely affects the general welfare of the state. Employers ... that deny employment opportunities and discriminate in employment against properly qualified individuals solely because of their age ... deprive those individuals of the earnings that are necessary to maintain a just and decent standard of living.

(2) It is the intent of the legislature to protect by law the rights of all individuals to obtain gainful employment and to enjoy privileges free from employment discrimination because of age, ... and to encourage the full, nondiscriminatory utilization of the productive resources of the state to the benefit of the state, the family, and all the people of the state.

Wis. Stat. § 111.321 Prohibited bases of discrimination.

Subject to ss. 111.33 to 111.36, no employer ... may engage in any act of employment discrimination as specified in s. 111.322 against any individual on the basis of age ....

Wis. Stat. § 111.322 Discriminatory actions prohibited.

Subject to ss. 111.33 to 111.36, it is an act of employment discrimination to do any of the following:

(2007–08).[9] The Equal Rights Officer did not find probable cause that CCS violated the WFEA when it terminated Ostlund.

¶ 24. Ostlund then appealed this initial determination and received a formal administrative hearing with the Equal Rights Division to address her claim. CCS moved to dismiss the complaint on the grounds that the Equal Rights Division lacked subject matter jurisdiction. CCS argued that Ostlund's position was "ministerial" under *Jocz v. LIRC*, 196 Wis. 2d 273, 538 N.W.2d 588 (Ct. App. 1995), and therefore that adjudication of the complaint would infringe upon its First Amendment rights.

¶ 25. The Equal Rights Division Administrative Law Judge, ("ALJ"), John L. Brown, made several findings of fact and concluded that Ostlund's position was not ministerial. ALJ Brown found that, though Ostlund did engage in religiously-related activities, her primary duty was to instruct her students in a core of secular disciplines. Therefore, ALJ Brown dismissed CCS's motion, concluding that adjudication of Ostlund's complaint would not violate CCS's Free Exercise rights, and that the Equal Rights Division had subject matter jurisdiction over Ostlund's age discrimination claim. ALJ Brown then ordered a hearing to determine whether there was probable cause that CCS violated the WFEA when it terminated Ostlund.

---

(1) To refuse to hire, employ, admit or license any individual, to bar or terminate from employment . . . any individual, or to discriminate against any individual in promotion, compensation or in terms, conditions or privileges of employment . . . because of any basis enumerated in s. 111.321.

[9] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

¶ 26. CCS appealed the Equal Rights Division ruling to the State of Wisconsin Labor and Industry Review Commission ("LIRC") for administrative review. LIRC held that ALJ Brown's decision was not final, and that the pending Equal Rights Division proceeding on probable cause prevented it from hearing CCS's appeal. Therefore, LIRC concluded that Wis. Admin. Code § DWD 218.21(1) (April 2004)[10] prevented it from reviewing the administrative decision.

¶ 27. CCS then sought judicial review in the La Crosse County Circuit Court, Dennis G. Montabon, Judge. CCS petitioned for reversal of LIRC's decision not to review the Equal Rights Division decision and for a declaratory judgment and writ of prohibition to prevent adjudication of the claim until administrative review was complete. The circuit court concluded that any investigation or judicial review of the discrimination claim would have to wait until LIRC made its decision on whether Ostlund's position was ministerial or not. The circuit court therefore granted CCS's writ of prohibition and remanded to LIRC for review of ALJ Brown's decision that Ostlund's position was not ministerial.

¶ 28. LIRC then reviewed the administrative decision of ALJ Brown and affirmed. Specifically, LIRC agreed with ALJ Brown's conclusion that Ostlund's

---

[10] Wis. Admin. Code § DWD 218.21(1) (April 2004) Petition for review by the Labor and Industry Review Commission.

APPEALS LIMITED TO FINAL DECISION AND ORDERS. Any party may file a written petition for review of a final decision and order of the administrative law judge by the labor and industry review commission. Only final decisions and orders of the administrative law judge may be appealed. A final decision is one that disposes of the entire complaint and leaves no further proceedings on the complaint pending before the division.

primary duty as a first-grade teacher was to instruct her students in a core of secular disciplines. LIRC agreed that teaching religion four times a week, leading prayers, referring to religious symbols, incorporating religious themes into classes, preparing liturgy, and supervising liturgy did not constitute Ostlund's primary duty. LIRC thus concluded that, Ostlund's position was not ministerial and adjudication of Ostlund's complaint would not violate CCS's First Amendment rights. Because LIRC determined that the DWD had jurisdiction, it concluded that a hearing should be held to determine whether there was probable cause that CCS engaged in age discrimination against Ostlund. CCS again sought judicial review of LIRC's decision in the La Crosse County Circuit Court.

¶ 29. The circuit court, now presided over by Judge Dale T. Pasell, agreed with LIRC that, despite Ostlund teaching religion, participating in religious activities with students, and using religious examples in her lessons, her primary duty was to teach secular subject matters to her students. Hence, the circuit court held that she was not a ministerial employee, and that adjudication of Ostlund's age discrimination claim under the WFEA could proceed.

¶ 30. CCS appealed, and the court of appeals also concluded that her position was not ministerial. *Coulee Catholic Schs. v. Labor & Indus. Review Comm'n, Dep't of Workforce Dev.,* 2008 WI App 68, ¶ 36, 312 Wis. 2d 331, 752 N.W.2d 341. In determining whether a teacher has a ministerial function, the court of appeals considered the "primary duties" test in *Jocz* and the three-factor test in *Starkman v. Evans,* 198 F.3d 173 (5th Cir. 1999). It chose to apply the primary duties test with an additional factor from *Starkman,* asking whether there were "largely religious" criteria for hiring teachers.

*Coulee Catholic Schs.*, 312 Wis. 2d 331, ¶¶ 31, 39. The court of appeals ultimately concluded:

> The religion class, prayers, and participation with her students in liturgies do not constitute the primary part of her work day and they are not the primary focus either of the job description or the job evaluation . . . . There is no evidence that there were any religious criteria for Ostlund to obtain the job, although there was required in-service religious training for all elementary teachers . . . . We conclude the hiring and in-service criteria support the conclusion that, while Ostlund had religious duties, they were not her primary duties.

*Id.*, ¶ 39. CCS then sought review before this court.

## III. STANDARD OF REVIEW

¶ 31. In reviewing the decision of an administrative agency, we review the agency decision and not the decision of the circuit court. *Liberty Trucking Co. v. Dep't of Indus. Labor & Human Relations,* 57 Wis. 2d 331, 342, 204 N.W.2d 457 (1973). Thus, we apply the same standard and scope of review as applied by the circuit court. *Id.* This case requires us to determine whether LIRC's decision infringes on the rights of CCS under the First Amendment of the United States Constitution and the Freedom of Conscience Clauses in Article I, Section 18 of the Wisconsin Constitution. This is an issue of constitutional law, which we review de novo. *Jocz,* 196 Wis. 2d at 304. Our scope of review is limited by Wis. Stat. § 227.57, which prohibits us from substituting our judgment for that of the agency as to the weight of the evidence on any disputed finding of

fact. Wis. Stat. § 227.57(6). However, we may set aside a finding of fact that is not supported by substantial evidence in the record. *Id.*

## IV. DISCUSSION

¶ 32. The right to practice one's religion according to the dictates of conscience is fundamental to our system of government. *See Rayburn v. Gen. Conference of Seventh-day Adventists,* 772 F.2d 1164, 1167 (4th Cir. 1985) ("Each person's right to believe as he wishes and to practice that belief according to the dictates of his conscience so long as he does not violate the personal rights of others, is fundamental to our system."). We are a nation committed to and founded upon religious freedom. *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 35 (2004) (O'Connor, J., concurring) (noting that we are a "Nation founded by religious refugees and dedicated to religious freedom").

¶ 33. This right is fundamental in a court of law not because religious freedom is broadly understood to be a basic human right, but because our nation's founders recognized and enshrined this right in our nation's Constitution. Roughly 60 years later, Wisconsinites saw fit to include more specific and more extensive protections for religious liberty in our state constitution.

¶ 34. We begin by analyzing religious freedom in the First Amendment of the United States Constitution. Then, we analyze the Wisconsin Constitution's religious freedom guarantees. Finally, we apply the federal and state constitutional provisions to Ostlund and her claim, ultimately concluding that her age discrimination claim impinges upon CCS's religious freedom in violation of both the U.S. and Wisconsin Constitutions.

## A. Religious Freedom under the U.S. Constitution

¶ 35. The First Amendment to the U.S. Constitution provides in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The first portion of this provision contains what is called the "Establishment Clause," and the second portion is called the "Free Exercise Clause."

¶ 36. Ostlund asserts that the Establishment Clause provides the adjudicatory principles for this case. She argues, for example, that giving religious employers an exemption from non-discrimination laws "dangerously encroaches upon the Establishment Clause's prohibition against furthering religion." Ostlund further asserts that the three-part Establishment Clause test announced by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602 (1971), should govern our determination of whether application of the WFEA here violates CCS's constitutional rights.[11] Though at times mentioning the Free Exercise Clause, Ostlund argues that the only relevant question here is whether the WFEA creates excessive government entanglement with religion under the third prong of the *Lemon* test.

██

¶ 37. Supreme Court case law and common sense, however, lead to the conclusion that it is the Free Exercise Clause, and not the Establishment Clause, that is implicated in this case. The Supreme Court has stated that religious organizations generally have the

---

[11] The *Lemon* test states that any statute (1) must have a secular purpose, (2) the principal or primary effect of which is neither to advance nor inhibit religion, and (3) which does not foster excessive government entanglement with religion. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13 (1971).

"power to decide for themselves, free from state inter-
ference, matters of church government as well as those
of faith and doctrine." *Kedroff v. St. Nicholas Cathedral
of Russian Orthodox Church in N. Am.,* 344 U.S. 94, 116
(1952). The Supreme Court then went further, explain-
ing that the Constitution forbids the state from inter-
fering with a church's selection of its leaders, and that
this protection was grounded in "the free exercise of
religion." *Id.; see also Rayburn,* 772 F.2d at 1168 ("Any
attempt by government to restrict a church's free choice
of its leaders thus constitutes a burden on the church's
free exercise rights."). This approach makes sense. We
do not see how granting churches and religious organi-
zations control over the selection of their leaders impli-
cates the establishment of religion or the favoring of
one religion over another. While excessive entangle-
ment with religion is in some sense at issue, it is at issue
only to the extent it burdens CCS's right to practice its
faith freely. Thus, we analyze this case under the Free
Exercise Clause.

■■■■■■

¶ 38. The Free Exercise Clause of the First
Amendment states that "Congress shall make no
law . . . prohibiting the free exercise" of religion. U.S.
Const. amend. I. This provision was incorporated
through the Fourteenth Amendment, that is, made
applicable to the states as well as the federal govern-
ment, in *Cantwell v. Connecticut,* 310 U.S. 296, 303
(1940). It is well settled that this provision protects not
only the right to freedom in what one believes, but
extends (with limitations) to acting on those beliefs. *See
Employment Div., Dep't of Human Res. of Oregon v.
Smith,* 494 U.S. 872, 877 (1990). This most basic of
freedoms is not just an individual right, but a collective
right. That is, both individuals and communities of

individuals have a right to the freedom of religion.[12] *See Rayburn,* 772 F.2d at 1167 (stating that religious freedom "is guaranteed not only to individuals but also to churches in their collective capacities").

¶ 39. Courts around the country have universally recognized that the First Amendment protects houses of worship from state interference with the decision of who will teach and lead a congregation. Every jurisdiction to consider the question has adopted what had been called the "ministerial exception."[13] The ministe-

---

[12] The extent of the Constitution's protection for freedom of religion presents vexing questions made all the more salient by the development of American society on two fronts. First, religious practice in the United States has become exceedingly more diverse than it was at the time of the founding. *Sch. Dist. of Abington Twp., Pa. v. Schempp,* 374 U.S. 203, 240–41 (1963) ("[O]ur religious composition makes us a vastly more diverse people than were our forefathers."). General laws are more likely to burden or prohibit aspects of religious practice because of this increasing diversity. Second, government has become significantly more intrusive and more involved in everyday life, including its regulation of churches. *See* Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy,* 81 Colum. L. Rev. 1373, 1373 (1981) (noting that "secular regulation of churches has increased substantially in recent years," and discussing the increasing litigation resulting from this trend).

[13] Though on first glance it appears problematic, few courts have been troubled by the Supreme Court's decision in *Employment Div., Dep't of Human Res. of Oregon v. Smith,* which held that there is no individual religious exemption from neutral laws of general applicability. 494 U.S. 872, 877 (1990). It is one thing to say that individuals may not disregard an otherwise neutral criminal law on the grounds that their conscience or religion require them to disobey it. It is quite another thing for the

rial exception is grounded in the idea that the "introduction of government standards [in]to the selection of spiritual leaders would significantly, and perniciously, rearrange the relationship between church and state." *Rayburn*, 772 F.2d at 1168–69. It recognizes that "perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large." *Id.*

¶ 40. The state certainly has a strong interest in eradicating discrimination, but courts "must distinguish incidental burdens on free exercise in the service of a compelling state interest from burdens where the 'inroad on religious liberty' is too substantial to be permissible." *Id.* at 1169 (citing *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981)). Recognition of a church's authority to make hiring and firing decisions does remove the church's decisions in these matters from the jurisdiction of the courts with respect to anti-discrimination laws, laws that are a compelling part of our national character in their own right. But this freedom does provide protection for the church's First Amendment-sanctioned autonomy. *Id.*

¶ 41. The ministerial exception has deep roots in American history, but was first articulated in the context of non-discrimination claims in *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972).[14] The ministe-

government to adjudicate, for example, an age discrimination claim against a denomination's mandatory retirement age for pastors.

[14] McClure was an officer in the Salvation Army, a church, and brought a gender discrimination suit after being dis-

rial exception was clarified and so named in *Rayburn*. Ordination is not required to be considered "ministerial."[15] *See Rayburn*, 772 F.2d at 1168–69. Rather, it is the function of the position that is primary.[16] *See id.*

¶ 42. The *Rayburn* court proposed a test for deciding when a position should be considered ministerial. It suggested an employee is ministerial if his or her "primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." *Id.* at 1169. This inquiry "necessarily requires a court to determine whether a position is important to the spiritual and pastoral mission of the church." *Id.* The court in *Rayburn* ultimately concluded that a pastoral care associate at a Seventh-day Adventist Church was "so significant in the expression and realization of Seventh-day Adventist beliefs that state intervention in the appointment process would excessively inhibit religious liberty." *Id.* at 1168.

---

charged. The Fifth Circuit Court of Appeals found that McClure was functionally a minister and that application of Title VII to the Salvation Army under these facts would violate the Free Exercise Clause of the First Amendment. *McClure v. Salvation Army*, 460 F.2d 553, 558–61 (5th Cir. 1972).

[15] The dissent decides that the nomenclature "ministerial exception" is not very precise, opting instead for the phrase "ecclesiastical exception." Dissent, ¶ 89 n.1. One cannot help but note that this departure in terminology from virtually every other case seems intended to make the exception exceedingly narrow.

[16] The dissent is very clear to say that a "lay" religious school teacher does not fall within the ministerial exception. *See, e.g.*, dissent, ¶¶ 89, 90, 97, 99, 122. One wonders how the dissent's analysis would change if Ostlund had been a nun instead of a lay teacher. The focus, however, should be on the function of the position, not the title or a categorization of job duties.

¶ 43. This test for determining whether a position is ministerial has subsequently been called the "primary duties test." In practice, the primary duties test has proved to be a flexible test without an answer key and has not yielded predictable results. *See Note, The Ministerial Exception to Title VII: The Case for a Deferential Primary Duties Test,* 121 Harv. L. Rev. 1776, 1788 (2008) ("[J]udicial evaluation of the role of employees —from parochial school teachers to church organists— has not created any discernibly consistent pattern.") (footnotes omitted); Janet S. Belcove-Shalin, *Ministerial Exception and Title VII Claims: Case Law Grid Analysis,* 2 Nev. L.J. 86, 115 (2002) ("Applying these guidelines to specific cases has not yielded consistent results.").

¶ 44. The crux of the problem with the application of the primary duties test is what the word "primary" means. Some courts have interpreted it to mean that religious tasks must encompass the largest share of the position, what might be called the "quantitative approach." These courts will look, in the education context, for example, at the amount of time spent on particular subjects deemed "secular" versus subjects deemed "religious," or at the number of job duties that can be classified as "religious" or deemed "secular." *See, e.g., Guinan v. Roman Catholic Archdiocese of Indianapolis,* 42 F. Supp. 2d 849 (S.D. Ind. 1998) (holding that ministerial status did not apply to a teacher at a Catholic elementary school where "the vast majority" of her duties involved teaching secular classes); *Redhead v. Conference of Seventh-day Adventists,* 440 F. Supp. 2d 211, 221 (E.D.N.Y. 2006) (holding that ministerial status did not apply to an elementary school teacher because "plaintiff's teaching duties were primarily secu-

lar," and "those religious in nature were limited to only one hour of Bible instruction per day and attending religious ceremonies with students only once per year."). This line of argument is the approach advanced by Ostlund in this case, and adopted by ALJ Brown,[17] LIRC,[18] the circuit court,[19] and the court of appeals.[20]

¶ 45. Another, and we think better, way to view the ministerial exception is from what might be called the "functional" approach. This perspective focuses more on the second statement in *Rayburn:* "whether a position is important to the spiritual and pastoral mission of the church." *Rayburn,* 772 F.2d at 1169. This is a more holistic approach in which activities such as teaching, church governance, and supervision of or participation in worship are relevant evidence as to the importance of the position to the spiritual and pastoral mission of a house of worship or religious organization. The primary concern here is the function of the employee, not only the enumerated tasks themselves.

---

[17] ALJ Brown concluded:

Measured by the amount of time Ms. Ostlund spent in non-religious versus religious activities, or by the number of religious versus non-religious functions contained in her job description and the evaluations of her performance of those functions, Ms. Ostlund's job was not primarily ministerial.

[18] LIRC quoted ALJ Brown's statement in footnote 17 above as part of its own conclusion.

[19] The circuit court insisted it was not trying to compartmentalize religion by dismissing the claimed integration of faith and learning in everything. It concluded nonetheless that her primary duties were still to teach secular subjects.

[20] The court of appeals found that Ostlund's religious duties "do not constitute the primary part of her work day and they are not the primary focus either of the job description or job evaluation." *Coulee Catholic Schs.,* 312 Wis. 2d 331, ¶ 39.

¶ 46. We reject a primary duties test that looks to see if the "vast majority" of tasks are religious, or whether a majority of the employee's time is spent on quintessentially religious tasks. This narrow view does not, in our view, sufficiently respect the constitutional imperatives of the free exercise of religion. It also serves to minimize or privatize religion by calling a faith-centered social studies class, for example, "secular" because it does not involve worship and prayer. What the quantitative approach means as a practical matter is that the state can interfere with the hiring and firing of the leaders of religious organizations and houses of worship so long as the leaders are spending (presumably) 49 percent or less of their time or tasks on whatever the court determines to be "religious" activities. This redounds in an intrusiveness inconsistent with the free exercise of religion.[21]

¶ 47. A functional analysis of the ministerial exception involves significantly less intrusion into the affairs of houses of worship and religious organizations. It envisages a more limited role for courts in determining whether activities or positions are religious. A functional analysis avoids reducing the significance of a position to a rote quantitative formula. In short, a functional analysis is truer to the First Amendment's protection of religious freedom.[22]

---

[21] The dissent asserts that we alter the primary duties test. Dissent, ¶ 89. What we have done is reject a version of the primary duties test used by some courts that reduces the inquiry into the ministerial role of an employee to a quantitative analysis and thus misses the bigger picture.

[22] The dissent contains numerous statements suggesting, though not stating outright, that we ought to defer to the Wisconsin Court of Appeals opinion in *Jocz v. LIRC,* 196 Wis. 2d 273, 538 N.W.2d 588 (Ct. App. 1995), which outlined a framing

¶ 48. A functional analysis of the ministerial exception has two steps. The first step is an inquiry into whether the organization in both statement and practice has a fundamentally religious mission. That is, does the organization exist primarily to worship and spread the faith? Any inquiry will be highly fact-sensitive. It may be, for example, that one religiously-affiliated organization committed to feeding the homeless has only a nominal tie to religion, while another religiously-affiliated organization committed to feeding the homeless has a religiously infused mission involving teaching, evangelism, and worship. Similarly, one religious school may have some affiliation with a church but not attempt to ground the teaching and life of the school in the religious faith, while another similarly situated school may be committed to life and learning grounded in a religious worldview.

¶ 49. The second step in the analysis is an inquiry into how important or closely linked the employee's work is to the fundamental mission of that organization. This again will be highly fact-specific. Relevant evidence as to the employee's importance to the religious mission of the organization will include objective employment indicators such as hiring criteria, the job application, the employment contract, actual job duties, performance evaluations, and the understanding or characterization of a position by the organization.[23]

of the primary duties test. *See, e.g.,* dissent, ¶ 109. As the dissent knows, our constitutional interpretation, though benefiting from previous courts, is de novo. *See Jocz,* 196 Wis. 2d at 304. Moreover, this opinion clearly explains why we depart from the framing of the issues outlined in *Jocz.*

[23] CCS argues that courts should defer to the characterization of a position by the organization or church. We believe

Teaching, evangelizing, church governance, supervision of a religious order, and overseeing, leading, or participating in religious rituals, worship, and/or worship services will serve as important factors, rather than the only evidence we measure or consider as under the quantitative approach. These quintessentially religious tasks will evince a close link and importance to an organization's religious mission.

¶ 50. It is helpful to review two cases that illustrate the approach we adopt today. In *Pardue v. Center City Consortium Schools of the Archdiocese of Washington, Inc.,* 875 A.2d 669 (D.C. 2005), the District of Columbia Court of Appeals held that the ministerial exception applied to a Catholic elementary school principal, thereby precluding her race discrimination and retaliation claims against the Archdiocese of Washington. *Id.* at 670.

¶ 51. The court's analysis focused, correctly in our view, on the directive in *Rayburn* to "determine whether a position is important to the spiritual and pastoral mission of the church." *Rayburn,* 772 F.2d at 1169. Thus, the court's analysis initially focused on the school's mission, concluding that the Catholic schools in the Archdiocese had a "pervasive religious mission" where instruction on faith and morals was "part of the total educational process." These Catholic schools were, the court found, "an integral part of the religious

courts should certainly consider the organization's understanding or characterization of a position, and it is likely that this will provide great insight into the centrality of a position to the organization's mission. The weight of this evidence is for the court to determine, however. We are not persuaded that an organization's characterization should be determinative or, by definition, be accorded greater weight than all other relevant evidence.

mission of the Catholic Church." *Pardue,* 875 A.2d at 675 (quoting *Lemon,* 403 U.S. at 615–16).

¶ 52. After this, the court examined the principal's function, which the lower court concluded was to communicate the school's message, one founded on religious belief, to the staff, students, and parents. *Id.* at 676–77. The court rejected the argument that because most of her daily responsibilities were no different from a public school principal, she could not have been a ministerial employee. The court explained: "[M]erely enumerating the duties in Pardue's job description, many under secular-sounding headings such as 'materials management' and 'office management,' tells us little about whether her 'position is important to the spiritual and pastoral mission of the church.' " *Id.* at 677 (citing *Rayburn,* 772 F.2d at 1169). Instead, the court concluded that her responsibilities when viewed as a whole were "inextricably intertwined in the school's mission." *Id.*

¶ 53. Similarly, in an unpublished opinion, the Fourth Circuit looked primarily at the mission of a Seventh-day Adventist school in determining that the ministerial exception precluded an elementary school teacher's discrimination claims. *Clapper v. Chesapeake Conference of Seventh-day Adventists,* No. 97–2648, 166 F.3d 1208 (table), 1998 WL 904528, *8 (4th Cir. Dec. 29, 1998). The court noted that the school's mission, or primary purpose, was "the salvation of each student's soul through his or her indoctrination in Seventh-day Adventist theological beliefs." *Id.* at *1. Teachers were a vital part of this mission, and were encouraged to look at teaching "as a holy vocation." *Id.* at *3. The court explicitly rejected the teacher's arguments that he was not ministerial because only one of his thirteen stated responsibilities was religious in nature. *Id.* at *6. It

found that the teacher taught the Bible, incorporated church teachings throughout the curriculum, and led the students in prayer, worship, and witnessing activities. *Id.* at *7.

¶ 54. In short, the court applied a functional analysis, choosing to understand teaching a "secular" class as not purely secular in the context of that religious school. Teachers were considered to have significant roles in the propagation of the faith even though a majority of their tasks and time was spent teaching a traditional academic curriculum. *Id.* The primary duties test was not a quantitative test, the court stated. *Id.* Instead, based on a total view of the facts, the central constitutional question is whether enforcement of the teacher's action "would substantially infringe upon the Chesapeake Conference's right to choose its spiritual leaders." *Id.* The court explained:

> While the relative quantity of time an employee of a religious entity spends directly teaching and spreading the faith, providing church governance, supervising a religious order, or supervising or participating in religious ritual and worship is important in determining whether those activities are the primary duties of such employee, the degree of the church entity's reliance upon such employee to indoctrinate persons in its theology is equally important.

*Id.* The court then concluded that "for the reasons previously set forth, the quantitative and qualitative combination of factual circumstances in the present case compels us to conclude that the primary duties test is satisfied." *Id.*

¶ 55. A functional analysis of the ministerial exception makes sense because, though it departs in form from the analysis used by many other courts, it gets to the real heart of the ministerial exception, which is

preventing the state from intruding into the mission of religious organizations or houses of worship. The state surely has a strong interest in ensuring fair employment opportunities regardless of age, race, and other such factors. Nonetheless, we conclude that the Wisconsin legislature oversteps its constitutional authority when its otherwise laudable efforts at fairness interfere with the hiring and firing of employees who are important and closely linked to the religious mission of a religious organization. Such actions impermissibly intrude upon the organization's exercise of religious liberty.

## B. Religious Freedom under the Wisconsin Constitution

¶ 56. Article I, Section 18 of the Wisconsin Constitution was included as part of Wisconsin's original constitution in 1848.[24] It provides as follows:

**Freedom of worship; liberty of conscience; state religion; public funds.** Section 18. The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.

¶ 57. As with any document, the interpretive task is to "ascertain its true intent and meaning." *State v. Beno,* 116 Wis. 2d 122, 136–37, 341 N.W.2d 668 (1984).

---

[24] The clause was amended in 1982 to change gender-specific language to gender-neutral language.

The authoritative, and usually final, indicator of the meaning of a provision is the text—the actual words used.[25] *See State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 44, 271 Wis. 2d 633, 681 N.W.2d 110 (discussing statutory interpretation).

¶ 58. The text here contains several clauses applying in different factual scenarios. It contains two clauses referring to the rights of conscience (the "Freedom of Conscience Clauses"), which we understand to refer generally to the exercise of religious freedom.[26]

---

[25] In *Beno,* we discussed a three-step process for interpreting our constitution. The court is to examine:

(1) The plain meaning of the words in the context used;

(2) The historical analysis of the constitutional debates and of what practices were in existence in 1848, which the court may reasonably presume were also known to the framers of the 1848 constitution; and

(3) The earliest interpretation of this section by the legislature as manifested in the first law passed following the adoption of the constitution.

*State v. Beno,* 116 Wis. 2d 122, 136–37, 341 N.W.2d 668 (1984) (citations omitted). In this case, we see little reason to extend our interpretation beyond the text. And even if we did engage in steps two and three, there is little historical evidence regarding the meaning of this provision in 1848 or shortly thereafter.

[26] In 1848, the year the Wisconsin Constitution was adopted, the Pennsylvania Supreme Court decided a case under its constitution, which contained nearly identical language with respect to the rights of conscience as our own. The court there defined the rights of conscience as "simply a right to worship the Supreme Being according to the dictates of the heart; to adopt any creed or hold any opinion whatever, or to support any religion; and to do, or forbear to do, any act for conscience' sake, the doing or forbearing of which is not prejudicial to the public." *Specht v. Commonwealth,* 8 Pa. 312, *9 (1848). That is to say,

The main right protected is to "worship Almighty God according to the dictates of conscience." This right is accorded to "every person." By logical extension and as affirmed by the Supreme Court with respect to First Amendment rights (*see Rayburn,* 772 F.2d at 1167), individuals also have the right to practice their religious faith in groups, as collections of individuals, and to form houses of worship and faith-based organizations committed to achieving their faith-based ends.

¶ 59. The Wisconsin Constitution uses the strongest possible language in the protection of this right. It provides that the right to worship as one is so convinced "shall *never* be infringed." It goes even further, stating, "nor shall *any control of, or interference with,* the rights of conscience be permitted." It is difficult to conceive of language being stronger than this. The question is, how do these strong prohibitions on state government apply here?

¶ 60. This court has stated that Article I, Section 18 serves the same dual purposes as the Establishment Clause and Free Exercise Clause of the U.S. Constitution. *State ex rel. Warren v. Nusbaum,* 55 Wis. 2d 316, 332, 198 N.W.2d 650 (1972). However, we have also recognized that these provisions, though sharing some similarities with the federal provisions, are not the same. *State v. Miller,* 202 Wis. 2d 56, 63–66, 549 N.W.2d 235 (1996). The protections and prohibitions in the Wisconsin Constitution are far more specific. And with regard to the rights of conscience, this clause contains extremely strong language, providing expansive protec-

the "rights of conscience" was another way of describing the right to believe and practice one's faith according to one's convictions.

tions for religious liberty. Thus, we are not limited to current First Amendment jurisprudence when interpreting our own constitutional protections for religious liberty; rather, we are required to give effect to the more explicit guarantees set forth in our state constitution. *Id.* at 65–66.

¶ 61. When faced with a claim that a state law violates an individual or organization's freedom of conscience, we have generally applied the compelling state interest/least restrictive alternative test. *Id.* at 66. Under this test, the religious organization has to prove (1) that it has a sincerely held religious belief, and (2) that such belief is burdened by the application of the state law at issue. Upon this showing, the burden shifts to the state to prove (3) that the law is based upon a compelling state interest (4) that cannot be served by a less restrictive alternative. *Id.*

¶ 62. This analysis—though appropriate in most circumstances[27] regarding laws burdening the rights of conscience—is not helpful here. The law at issue in this case is not simply a burden on an individual's or organization's religious beliefs; it is an effort by the state to intrude into the hiring and firing decisions of a religious organization. As we have previously stated, Article I, Section 18 "operate[s] as a perpetual bar to the state from the infringement, control, or interference with" the rights of conscience. *State ex rel. Weiss v. Dist.*

---

[27] When *Miller* was decided, this was a correct statement of the law applicable to the First Amendment's protection for religious freedom. However, the Supreme Court overturned this as it applies to state laws in *City of Boerne v. Flores,* 521 U.S. 507 (1997). We still believe, however, that this is the appropriate standard under the Wisconsin Constitution for most laws burdening religious belief.

*Bd. of Sch.-Dist. No. 8 of City of Edgerton*, 76 Wis. 177, 210–11, 44 N.W. 967 (1890).

██

¶ 63. No one could legitimately claim, for example, that the state's compelling interest in prohibiting racial discrimination (and a law narrowly tailored to doing precisely that) would allow the state to adjudicate a race discrimination claim in the selection of a religious leader such as a priest, pastor, rabbi, imam, etc. There is no weighing of the state's interest or examination of whether the law is narrowly tailored to achieve that interest. The state simply has no authority to control or interfere with the selection of spiritual leaders of a religious organization with a religious mission. The text of our constitution states that the state cannot do it—at all. The main inquiry is not how important the right in question is, but whether the law is "controlling" or "interfering with" religious freedom.

¶ 64. By analogy, the Thirteenth Amendment of the U.S. Constitution provides: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII. We think it inconceivable that one might conclude slavery can exist in the United States as long as the state has a compelling interest. The text is clear—slavery is not allowed.

██

¶ 65. We do not mean to suggest that anything interfering with a religious organization is totally prohibited. General laws related to building licensing, taxes, social security, and the like are normally acceptable. Similarly, employment discrimination laws applying to employees who are not in positions that are

important and closely linked to the religious mission of a religious organization also do not rise to the level of control or interference with the free exercise of religion.

¶ 66. The Wisconsin Constitution, with its specific and expansive language, provides much broader protections for religious liberty than the First Amendment. *Miller,* 202 Wis. 2d at 64. We need not explore the outer boundaries of those protections here. But it is clear that the Wisconsin Constitution provides at least the protections contained in the First Amendment as outlined earlier in this opinion.

¶ 67. Thus, the state may not interfere with the hiring or firing decisions of religious organizations with a religious mission with respect to employees who are important and closely linked to that mission. These employees are "ministerial." With respect to these ministerial employees, laws such as the WFEA constitute an impermissible effort to control or interfere with the organization's rights of conscience in violation of Article I, Section 18 of the Wisconsin Constitution.[28]

C. Application to Ostlund

¶ 68. This case is heavily fact-dependent. As such, our treatment of the facts is important to our disposition of the case. As discussed above, we defer to facts

---

[28] Even if the Supreme Court were to construe the First Amendment in a fashion inconsistent with our application today, our holding that the Wisconsin Constitution provides an independent basis for the ministerial exception's broader application would clearly remain the standard in Wisconsin. This is so because the text warrants it.

found by the agency (in this case, LIRC adopted the ALJ's findings of fact) as long as they are substantially supported by the record. Wis. Stat. § 227.57(6).

¶ 69. However, two caveats are relevant. First, our review is of the entire record. *See* Wis. Stat. § 227.57(1). We thus consider unrebutted facts in the record so long as they do not conflict with those found by LIRC. Additionally, we will not defer to characterizations of facts found by LIRC, particularly where those characterizations are couched as legal judgments. Here, there are at least two findings of fact that are characterizations or legal judgments. LIRC finding of fact 16 states that the textbooks were not religious and that, except for a Christmas unit, "her instruction in social studies was not primarily religious." However, Ostlund testified that she incorporated (or attempted to incorporate) religious examples and values into everything she taught. Whether or not her teaching of social studies was "primarily religious" is more a characterization or legal judgment than a factual finding to which we owe deference.

¶ 70. LIRC finding of fact 25 similarly states that "religious related activities did not constitute her primary duty." This finding of fact is particularly intriguing in that it uses the language of the primary duties test. To the extent finding of fact 25 purports to answer the question before us, we reject that finding of fact as to its characterization or legal judgment. While it may be that the majority of her duties were teaching "secular" subjects, it does not follow that her "primary duties" were secular for purposes of determining whether the ministerial exception applies.

¶ 71. In our previous analysis, we concluded that the Wisconsin Constitution provides at least the protections guaranteed by the U.S. Constitution. Thus, we proceed under the functional analysis of the ministerial exception as outlined in the First Amendment discussion above. That is, we look to whether Ostlund's position was important and closely linked to the religious mission of a religious organization. We conclude that it was.

¶ 72. Our first inquiry is into the nature and mission of Ostlund's employer—Coulee Catholic Schools. The record is clear that CCS has a religious mission and substantially practices it. CCS is an entity committed to marshalling the resources and expertise of the Catholic schools in the Diocese of La Crosse. CCS is an entity of the Catholic Church itself, subject to the authority of the Bishop of La Crosse, who himself approved certain CCS rules and policies.

¶ 73. CCS is committed to a distinctly Catholic education aimed at a "Christian concept of life." The preamble to the CCS Faculty and Staff Handbook explicitly stated that Catholic school education is an essential part of the Catholic Church's efforts to live out its mission "to proclaim the kingdom of God." Consistent with this mission, Catholic elementary and secondary schools are called "educational ministry." CCS is committed to an "education rooted in the Gospel of Jesus Christ" that "celebrates the development of Gospel faith and identity through sacrament and service." It aims to be a worship-filled educational environment with a faith-centered approach to learning. It is beyond dispute, then, that CCS has a religious mission.

¶ 74. The actual practice of Ostlund's school substantially affirms that CCS gives life to the words of its

316

mission. Teachers made efforts to integrate Catholic values into various aspects of the curricula.[29] This

[29] Based on facts such as this, the dissent argues· that our decision today somehow implicates the constitutionality of the Milwaukee Parental Choice Program ("MPCP"), which this court upheld in *Jackson v. Benson,* 218 Wis. 2d 835, 578 N.W.2d 602 (1998). Dissent, ¶ 112. This argument is mistaken, reflecting a misreading of this court's decision in *Jackson* and a failure to apply subsequent Supreme Court precedent that has now settled the matter.

First, we did not make the facts up in this case. The dissent is troubled not by our reasoning or even our approach to the facts, but by the facts themselves. Indeed, the dissent never challenges the unrebutted evidence from the record that CCS was aiming to integrate the Catholic faith into the whole educational process, and Ostlund testified that she made efforts to do this. These are the facts before us and upon which we must base our decision.

Second, contrary to the dissent's assertions, the opt-out provision played only a minor, inconsequential role in our opinion in *Jackson*. As the dissent acknowledges but never grapples with, *Jackson* was decided on the basis of the Establishment Clause of the U.S. Constitution, and the "benefits clause" and "compelled support clause" of Article I, Section 18 of the Wisconsin Constitution (other issues were discussed, but are not relevant here). *See Jackson,* 218 Wis. 2d at 875–76.

In its analysis under the First Amendment's Establishment Clause, the court in *Jackson* applied the *Lemon* test (*see supra* ¶ 36 and n.11). *See Jackson,* 218 Wis. 2d at 856. The main question in the analysis was whether the program had the primary effect of advancing or inhibiting religion. *Id.* at 858–73. Analyzing Supreme Court precedent, we identified the dual principles of neutrality and indirect aid. *Id.* at 860. We thus stated the rule as follows:

[S]tate educational assistance programs do not have the primary effect of advancing religion if those programs provide public aid to both sectarian and nonsectarian institutions (1) on the basis of neutral, secular criteria that neither favor nor disfavor religion;

317

included integrating theological and moral principles into each subject, as well as use of religious example-

and (2) only as a result of numerous private choices of the individual parents of school age children.

*Id.* at 869. The analysis was straightforward based on these criteria. The MPCP was neutral and offered aid to religious schools only through individual parental choice. *Id.* at 872–73.

We further stated that the program did not create excessive government entanglement with religion merely because the state would have some minimal oversight, auditing, health, and other such obligations. *Id.* at 874.

It is true that the opt-out provision was mentioned in the analysis, but this needs to be placed in perspective. The Establishment Clause analysis in *Jackson* is contained in ¶¶ 20–52 and pages 853–76 of the official Wisconsin Reports. In 33 paragraphs covering 24 pages of analysis under the U.S. Constitution, the court mentioned the opt-out provision exactly one time in one sentence. The opt-out clause was a factor, but merely a negligible one in the court's analysis.

Our analysis of the benefits clause of the Wisconsin Constitution queried whether the MPCP had the principal or primary effect of advancing religion. *Id.* at 878. Employing the same analysis as under the Establishment Clause, namely, the neutrality and indirect aid principles, we concluded that the MPCP did not violate the benefits clause of the Wisconsin Constitution. *See id.* at 876–82. The opt-out provision which so preoccupies the dissent, was not mentioned at all in the 10 paragraphs and 7 pages of this analysis in the Wisconsin Reports.

Finally, the *Jackson* court determined that the provision did not violate the compelled support clause of the Wisconsin Constitution. The court did reference the opt-out provision as relevant to this analysis, but it seems clear that the program compels no child to attend or participate in religious classes or activities unless the parent chooses to send them to that religious school. *See id.* at 883.

Even so, the MPCP was not upheld because the court concluded that religious schools are not really all that religious anyway. There is no evidence that the integration of religious

318

sand symbols that would not be found in a public school. Students were taught the Catholic faith in a daily religion class, and celebrated Mass weekly. The students also prayed at points throughout the day and celebrated religious holidays. Teachers were required to teach, support, and exemplify Catholic doctrine and morality, and they were to help foster spiritual growth among their students.

¶ 75. In short, CCS member schools are not just public schools with a few supplemental religious extras. CCS was explicitly and intentionally faith-centered, and the record supports that CCS tried to live out its mission.

¶ 76. The second step in our inquiry is an examination of Ostlund's position itself and the degree to which it is important and closely linked to CCS's

---

values into classes and school life was unknown to the court, or conversely, that the court considered the opt-out provision sufficient to keep all religious influences away from participating children.

Possibly the most confusing aspect of the dissent's discussion on this point is that it completely ignores Supreme Court precedent that has since settled this issue. In *Zelman v. Simmons-Harris,* 536 U.S. 639 (2002), the Supreme Court considered the constitutionality of Cleveland's school voucher program. There is no evidence that Cleveland's program had a similar opt-out provision. Yet, the Supreme Court took the same approach as this court did in *Jackson,* identifying the two governing principles as neutrality and private choice, and found that the Cleveland program was neutral and a program of true private choice, and thus did not violate the Establishment Clause. *Zelman,* 536 U.S. at 662–63. Therefore, even if the dissenters are not comfortable with a school choice program that does not completely insulate children in religious schools from religion, the Supreme Court has spoken: There is no Establishment Clause violation.

mission. As a first-grade teacher at St. Patrick's Elementary School, one of the CCS schools, it is obvious that Ostlund's role was of high importance and closely linked to the mission of the school—the inculcation of a Christ-centered concept of life.

¶ 77. The record supports this characterization. Ostlund led prayer with her students, incorporated religious examples, symbols, and stories into other subjects, and helped celebrate school-wide celebrations of religious holidays. Significantly, Ostlund was a catechist for four days per week; that is, she taught Catholic doctrine and practice to her students. Ostlund also took her students to Mass each week, sometimes planning Bible readings and writing prayers for worship services. Ostlund was important and closely linked to the religious mission of CCS with regard to her first-grade students.

¶ 78. Ostlund was required to obtain basic and advanced certifications in religious instruction. This means she was required to and did receive ongoing training and instruction on how to teach the Catholic faith to her students. She further agreed to model and support Catholic teaching. In her job description, which also served as the template for her performance evaluation, her first responsibility was to maintain a "Religious Atmosphere," which required her to "[p]rovide a good Christian model and example," "[e]ncourage spiritual growth in students," and "[p]rovide leadership in living and celebrating life and liturgies." Ostlund acknowledged her efforts to incorporate Catholic values and encourage spiritual growth throughout the day, not just in religion class.

¶ 79. The evidence shows that Ostlund's position as a first-grade teacher was important and closely linked to the religiously-infused mission of the school.

320

In particular, her specific obligations to contribute to worship services and teach Catholic doctrine to her students point to her significance in the religious mission of the school. Ostlund was required to perform quintessentially religious tasks as a central part of her job, and her role was an essential part of the Catholic Church's educational ministry to its youth.

¶ 80. In sum, Ostlund was not simply a public school teacher with an added obligation to teach religion. She was an important instrument in a faith-based organization's efforts to pass on its faith to the next generation. The state and federal constitutions do not permit the state to interfere with employment decisions regarding teachers, like Ostlund, who are important and closely linked to the religious mission of CCS.

¶ 81. Our jurisprudential approach and outcome are not novel. Other courts have reached similar results to our holding today.[30] Other courts who have consid-

---

[30] In addition to those discussed in *supra* ¶¶ 50–54, *see, e.g., EEOC v. Hosanna-Tabor Evangelical Lutheran Church & Sch.,* 582 F. Supp. 2d 881 (E.D. Mich. 2008) (holding that the ministerial exception applied to a kindergarten teacher who taught at a Lutheran school offering a "Christ-centered education" and where she received the title of "commissioned minister" from the Lutheran Church—Missouri Synod, even though she did not need to be Lutheran and the teacher's religious-oriented tasks took up only about 45 minutes of her 7 hour day); *Stately v. Indian Cmty. Sch. of Milwaukee, Inc.,* 351 F. Supp. 2d 858, 868 (E.D. Wis. 2004) (holding that the ministerial exception applied to an elementary school teacher because the school required the teacher to integrate Native American culture and religion into her classes, she participated in and sometimes led the school's religious ceremonies and cultural activities, and she helped develop her students spiritually); *Porth v. Roman Catholic Diocese of Kalamazoo,* 532 N.W.2d 195 (Mich. Ct. App. 1995) (holding that an elementary school teacher's discrimination claims were barred by the First Amendment, and even though

ered similar cases have reached the opposite result.[31]

¶ 82. We address two factual counterarguments. First, the lower courts were particularly affected by the fact that Ostlund was not required to be Catholic (a finding adopted by LIRC and binding upon us if, as it is, substantially supported by the record). It may seem, at first blush, counterintuitive to call a position "ministerial" when the person occupying it is not required to be a member of the faith she is ministering. But this ignores the fact that Ostlund was still required to engage in Catholic worship, model Catholic living, and impart Catholic teaching. Thus, though it may be that she was not required to be Catholic (the record is clear, however, that she was a practicing member of the

---

the balance of her duties was teaching secular subjects, the teacher's overall duties were "inexorably intertwined with the primary function of defendants' school, which is the education of its students consistent with the Catholic faith").

[31] *See, e.g., DeMarco v. Holy Cross High Sch.,* 4 F.3d 166 (2d Cir. 1993) (holding that the ministerial exception did not apply to a lay teacher who brought an ADEA action against a parochial school even though the teacher performed some religious duties, including leading his students in prayers and taking them to Mass); *Redhead v. Conference of Seventh-day Adventists,* 440 F. Supp. 2d 211 (E.D.N.Y. 2006) (holding that the ministerial exception did not apply to an elementary school teacher who taught primarily secular subjects but also taught religion for an hour a day and attended religious ceremonies with students once per year); *Guinan v. Roman Catholic Archdiocese of Indianapolis,* 42 F. Supp. 2d 849 (S.D. Ind. 1998) (holding that the ministerial exception did not apply to a teacher at a Catholic elementary school because teachers at this school were not required to be Catholic, the vast majority of classes she taught were secular, and she did not lead worship services); *EEOC v. Tree of Life Christian Schs.,* 751 F. Supp. 700 (S.D. Ohio 1990) (holding that the ministerial exception did not apply to parochial school teachers and administrators).

church connected to the school), she was required to live, embody, and teach Catholicism in her role as a teacher consistent with the mission of the school.

¶ 83. Previous courts also pointed to the "secular" teaching materials as important. But as discussed above, Ostlund testified that she made efforts to integrate Catholicism into all her subjects. The fact that she used a secular social studies book does not mean that the social studies class was "secular." Ostlund claims she used religious examples and brought Catholic teaching into all of her subjects.

¶ 84. In our holding today, we are not giving a blanket exception to all religious school teachers. Future cases along these lines will necessarily be very fact-sensitive. But here, the state has no constitutional authority to regulate the hiring and firing decisions of CCS for this first-grade teaching position.[32]

¶ 85. Some also might argue that religious organizations should not be accorded deference or special freedoms to which other non-religious but otherwise similarly situated organizations are not entitled. That

---

[32] Ostlund also argues that even if she is held to be a ministerial employee, LIRC may nonetheless hear the claim because CCS does not assert that Ostlund was terminated for religious reasons. We disagree. Ostlund mistakenly assumes that the only constitutional right at stake is non-establishment of religion, whereby the state must make a decision as to the theological views of a church. This, as we have explained, is the wrong question. Therefore, Ostlund may not pursue her claim under the WFEA. *See Rayburn v. Gen. Conference of Seventh-day Adventists,* 772 F.2d 1164, 1169 (4th Cir. 1985) (holding that the role of the employee, not the reason for the employee's dismissal, is the operative question). As the court in *Rayburn* stated, "In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning [for the dismissal] than it may supervise doctrinal content." *Id.*

may or may not be true as a matter of policy, but it is not relevant to our analysis because religious freedom is accorded a special status in both our state and federal constitutions.

■

¶ 86. The U.S. Constitution is a supermajoritarian document.[33] *See generally,* John O. McGinnis & Michael B. Rappaport, *Our Supermajoritarian Constitution,* 80 Tex. L. Rev. 703 (2002). That is, when a supermajority of citizens believes that our framework of government needs to be changed, or that a fundamental right or protection or value is needed, it can be changed. And this change binds future generations, including the acts of future legislatures. As a court, our job is to interpret and apply the law the people adopt, not to make it up in accord with ours or society's current policy preferences.

¶ 87. We recognize that the state has a strong interest in preventing age discrimination in society as a whole. Our opinion today is a determination that Ostlund's role is ministerial and is therefore an expression of CCS's free exercise of religion. This, the people of Wisconsin and the people of the United States have chosen to protect as a fundamental constitutional right. The state's attempted interference with and control of CCS's hiring decisions is prohibited not as a matter of policy, but as a matter of constitutional law.

---

[33] The Wisconsin Constitution can be amended either by a constitutional convention, which has never been used, or by majority votes in each house of the legislature in two consecutive legislatures followed by a majority vote of the electorate. Wisconsin Const. art. XII.

## V. CONCLUSION

¶ 88. We conclude that both the Free Exercise Clause of the First Amendment of the United States Constitution and the Freedom of Conscience Clauses in Article I, Section 18 of the Wisconsin Constitution preclude employment discrimination claims under §§ 111.31 to 111.395 of the Wisconsin Fair Employment Act for employees whose positions are important and closely linked to the religious mission of a religious organization. In the case at bar, Ostlund's school was committed to a religious mission—the inculcation of the Catholic faith and worldview—and Ostlund's position was important and closely linked to that mission. Therefore, Ostlund's age discrimination claim under the WFEA unconstitutionally impinges upon her employer's right to religious freedom. Accordingly, we reverse the court of appeals decision and remand to the circuit court to dismiss Ostlund's claim.

*By the Court.*—The decision by the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 89. N. PATRICK CROOKS, J. (*dissenting*). As a result of the majority opinion, our court is reaching the anomalous conclusion that a first-grade lay school-teacher at a Catholic school fits within the narrow "ecclesiastical"[1] exception barring adjudication of her

[1] Courts have used the terms "ministerial" and "ecclesiastical" interchangeably to describe the function of employment positions that fall within the exception. *See, e.g., Miller v. Bay View United Methodist Church, Inc.*, 141 F. Supp. 2d 1174, 1180 (E.D. Wis. 2001); *Jocz v. LIRC*, 196 Wis. 2d 273, 301, 538 N.W.2d 588 (Ct. App. 1995). Although most courts have described the

age discrimination suit against her employer. To reach that conclusion, the majority improvidently alters the primary duties test that Wisconsin courts and a significant majority of other jurisdictions have applied when confronted with the question of whether to apply the ecclesiastical exception. I disagree with the majority's conclusion that the Free Exercise Clause of the First Amendment to the United States Constitution and the freedom of conscience clauses in Article I, Section 18 of the Wisconsin Constitution preclude adjudication of this claim.

¶ 90. Moreover, while I recognize the majority's analysis under the First Amendment centers on the Free Exercise Clause, the majority's sweeping language and analysis nonetheless jeopardizes this court's longstanding decisions under the Establishment Clause of the United States Constitution, and the benefits clause and compelled support clause in Article I, Section 18 of the Wisconsin Constitution. Specifically, the majority's conclusion that based on the facts here CCS infuses its secular subjects with religion effectively extends a free pass to religious schools to discriminate against their lay employees; moreover, it undoubtedly threatens this court's decision in *Jackson v. Benson,* 218 Wis. 2d 835, 578 N.W.2d 602 (1998), and, consequently, the continued viability of the Milwaukee school choice program. Accordingly, I dissent.

¶ 91. As an initial matter, I cannot subscribe to the majority's view that the primary duties test should be altered by supplementing it with its self-styled "functional analysis." Indeed, given that "our job is to

exception as the "ministerial exception," I use the word "ecclesiastical" (rather than "ministerial") throughout this dissent because it is a more precise term than ministerial and avoids confusion with an exception to immunity in other contexts.

interpret and apply the law the people adopt, not to make it up in accord with ours or society's current policy preferences," majority op., ¶ 86, an examination of Wisconsin court precedent, and the majority of other jurisdictions that use that test, counsels for our continued use of the primary duties test. Wisconsin courts and a majority of other jurisdictions have applied the test to determine whether the ecclesiastical exception should apply to a lay teacher[2] at a religious school.

¶ 92. As a matter of context, the law, as it stood when this case moved its way up through the administrative hearings, the circuit court, and the court of appeals, was well-established: The United States Constitution and the Wisconsin Constitution do not categorically deprive courts of subject matter jurisdiction to hear and adjudicate employment discrimination claims against religious organizations because doing so "would dangerously encroach upon the Establishment Clause's prohibition against furthering religion by providing a benefit exclusively to a religious association." *Jocz v. LIRC,* 196 Wis. 2d 273, 300, 538 N.W.2d 588 (Ct. App. 1995); *see also Sacred Heart Sch. Bd. v. LIRC,* 157 Wis. 2d 638, 644, 460 N.W.2d 430 (Ct. App. 1990). However, our courts have also recognized that the First Amendment and Wisconsin Constitution may preclude investigation and adjudication of discrimination complaints in some cases where doing so would impinge on a religious organization's ability to choose ministers to

---

[2] The facts presented here involve a lay teacher. It is unnecessary in this case to speculate on the question of how the ecclesiastical exception would apply "if Ostlund had been a nun instead of a lay teacher." Majority op., ¶ 41 n.16. A nun who is a teacher may very well have primary duties that would differ from the primary duties of a lay teacher. In any event, that question is not before us.

327

teach and interpret its doctrine and policy. *Jocz,* 196 Wis. 2d at 300. The rationale for that exception reflects an interest in allowing religious associations the right to choose ministers or persons in similar positions without interference by state courts or quasi-judicial agencies interpreting religious canons, doctrines, or policies. *Id.* at 300–01.

¶ 93. Accordingly, when confronted with the question of whether an employee of a religious organization fits within the ecclesiastical exception, our agencies and courts apply the primary duties test: An employee fits within the ecclesiastical exception if "the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual or worship . . . ." *Jocz,* 196 Wis. 2d at 303 (citing *Rayburn v. Gen. Conference of Seventh-Day Adventists,* 772 F.2d 1164 (4th Cir. 1985)). As the factors demonstrate, the central purpose of this test is to allow a court to distinguish between individuals for whom employment decisions by a religious group are likely to require a court to interpret matters of religious faith, doctrine, and governance, and those for whom employment decisions are highly unlikely to require a court to investigate such matters. *See Pritzlaff v. Archdiocese of Milwaukee,* 194 Wis. 2d 302, 327, 533 N.W.2d 780 (1995).

¶ 94. Given that background, ALJ Brown, LIRC, the circuit court, and the court of appeals all applied that law and ultimately concluded that Ostlund's position was not ecclesiastical. ALJ Brown's reasoning, as adopted by LIRC, is particularly cogent in its explanation of why Ostlund's position properly fell outside the ecclesiastical exception under the primary duties test:

In practical terms, the idea that, as a teacher, Ms. Ostlund should try to infuse religion into her secular subjects, and should strive to create a religious "atmosphere" in her class, meant that, *while she performed her primary duty of teaching the typical, secular school curriculum,* she occasionally made references to moral or religious lessons, or to religious symbols or rituals. This did not make her job ministerial. Not one example in case law has been cited for holding that a teacher employed by a religious association who taught something other than exclusively religious subjects has a ministerial position, preventing adjudication of a complaint under an employment discrimination law (other than for discrimination on the basis of religion). On the other hand, a number of court decisions considering this issue have found that the position was not ministerial and/or that there was no unconstitutional entanglement with the free exercise clause.

¶ 95. Of course, that is not to say that the primary duties test is definitive. As tests designed for agencies and courts to apply on a case-by-case basis often go, the test speaks in some degree of generality. *See Jocz,* 196 Wis. 2d at 303 ("While this test is not meant to provide the exclusive definition of 'ministerial' or 'ecclesiastical' functions, it should provide a basic framework for reviewing agencies or courts to follow when addressing the prima facie question of whether a position is entitled to constitutional protection from state interference."). For example, when confronted with the facts here, it is not patently clear when one of Ostlund's specific duties falls within the categories identified in the primary duties test, and what makes a particular duty "primary."

¶ 96. Thus, our task is to identify how broadly or narrowly we resolve those questions. To accomplish that, I believe that the correct approach is much like

that taken by the court of appeals[3] in this case: examining the sources of the primary duties test for a guiding principle, and supplementing that examination by considering other jurisdictions' decisions in which those courts determined whether the ecclesiastical exception applied in circumstances similar to those presented here.

¶ 97. The source of the primary duties test in Wisconsin is *Jocz,* 196 Wis. 2d at 301. In that case, the court relied on *McClure v. Salvation Army,* 460 F.2d 553 (5th Cir. 1972), and *Rayburn* in adopting the primary duties test. Of those two cases, *Rayburn* provides an especially helpful analysis of the constitutional basis for the ecclesiastical exception. In that case, which involved allegations of discrimination under Title VII of the Civil Rights Act by a woman who was denied an associate pastor position in the Seventh-day Adventist Church, the court observed that the primary duties test "necessarily requires a court to determine whether a position is important to the spiritual and pastoral mission of the church." *Rayburn,* 772 F.2d at 1169. After concluding that the associate pastor position was of that nature, the court observed that the Free Exercise Clause properly precludes adjudication of "quintessentially religious" matters because those matters present a danger of adjudicative bodies making an "inroad on religious liberty" that is "too substantial to be permissible." *Id.* However, the court also emphasized that the state's interest in enforcing discrimination laws was one "of

---

[3] In an appeal following an administrative agency decision, this court reviews the decision of the agency, in this case, LIRC. *See County of Dane v. LIRC,* 2009 WI 9, ¶ 14, 315 Wis. 2d 295, 759 N.W.2d 571. However, this court benefits from the analyses of the circuit court and the court of appeals. *Seider v. O'Connell,* 2000 WI 76, ¶ 27, 236 Wis. 2d 211, 612 N.W.2d 659.

the highest order," and that courts could properly adjudicate "the secular employment decisions of a religious institution," such as a lay teacher at a religious school or an editorial secretary in a sectarian-based publishing house. *Id.* (citations omitted).

¶ 98. I derive from *Rayburn,* as did the court of appeals, the principle that in cases involving discrimination claims the ecclesiastical exception properly overrides enforcement of those claims only when the employee's position is quintessentially religious. In other words, the ecclesiastical exception is designed to remain just that—an exception—reserved for positions of spiritual leadership.

¶ 99. Moreover, other jurisdictions evaluating whether the ecclesiastical exception applied to lay teachers at primary or secondary religious schools alleging employment discrimination against their employers have held, consistently with that principle from *Rayburn,* that those employees did not fit within the ecclesiastical exception.[4]

---

[4] Although not all of those courts expressly applied the primary duties test, those cases are relevant to this court's analysis. For example, several courts, in addressing whether the exception applies to lay teachers, looked to *Rayburn v. General Conference of Seventh-Day Adventists,* 772 F.2d 1164 (4th Cir. 1985), for guidance on defining the scope of the exception but did not expressly apply the primary duties test. *See, e.g., Dole v. Shenandoah Baptist Church,* 899 F.2d 1389 (4th Cir. 1990) (no ecclesiastical exception for elementary and high school teachers in Baptist school system who teach Bible study and integrate biblical material into secular subjects, but who did not perform sacerdotal functions, serve as church governors, or belong to a clearly delineated religious order); *EEOC v. Fremont Christian Sch.,* 781 F.2d 1362 (9th Cir. 1986) (no ecclesiastical exception for elementary and high school teachers required to follow specific tenets of faith); *EEOC v. Tree of Life Christian Sch.,* 751

¶ 100. Significantly, *Guinan v. Roman Catholic Archdiocese of Indianapolis,* 42 F. Supp. 2d 849 (S.D. Ind. 1998), offers nearly identical duties—and, if anything, even more directly religious duties—than the instant case does, yet that court concluded that the ecclesiastical exception did not apply. That case involved a fifth-grade Catholic school teacher, Guinan, who taught religion class and secular courses, was a "Catechist," identified one of her principal duties to be "an example of Christianity" and an "evangelist" to her students, and organized one Mass per month. The court concluded that because the vast majority of her duties were teaching secular courses and because the school did not require its instructors to be Catholic, Guinan did not fit within the ecclesiastical exception. *Id.* at 853.

¶ 101. That court went on to emphasize, "Moreover, the application of the ministerial exception to non-ministers has been reserved generally for those positions that are, at the very least, close to being

F. Supp. 700 (S.D. Ohio 1990) (no ecclesiastical exception for primary through secondary school teachers, even though they view their primary responsibility to be inculcating the students with Christianity). Nonetheless, those decisions are consistent with the underlying principle in *Rayburn* and with the reasoning by other courts that have expressly applied the primary duties test to a lay teacher at a religious primary or secondary school. *See, e.g., Redhead v. Conference of Seventh-Day Adventists,* 440 F. Supp. 2d 211 (E.D. N.Y. 2006) (no exception applies where Seventh-day Adventist school's lay teacher had generally secular duties except for one daily hour of Bible instruction and attendance at a religious ceremony once a year); *Gallo v. Salesian Soc'y, Inc.,* 676 A.2d 580 (N.J. Super. Ct. App. Div. 1996) (no exception applies to a secondary English and history teacher who was required to exemplify Christian principles in her teaching and to begin class with a prayer, and who taught at a school with a religious philosophy and purpose).

exclusively religious based, such as a chaplain or pastor's assistant." *Id.* (citing *Scharon v. St. Luke's Episcopal Presbyterian Hosps.,* 929 F.2d 360 (8th Cir. 1991), and *Rayburn,* 772 F.2d at 1164).

¶ 102. From the cases discussed, I cull, as did the court of appeals, several persuasive points: First, those cases reject the proposition that the primary duties test may be satisfied in favor of the employer school simply because that school has a religious mission. *See, e.g., Dole v. Shenandoah Baptist Church,* 899 F.2d 1389, 1392, 1396 (4th Cir. 1990); *EEOC v. Tree of Life Christian Sch.,* 751 F. Supp. 700, 706 (S.D. Ohio 1990). Second, those cases also reject, as a determinative factor, a stated duty by teachers to serve as a model of particular religious values. *See, .e.g., Guinan,* 42 F. Supp. 2d at 852 n.6; *Gallo v. Salesian Soc'y, Inc.,* 676 A.2d 580, 588 (N.J. Super. Ct. App. Div. 1996). Indeed, neither of those factors would appear to distinguish between ecclesiastical and non-ecclesiastical positions; those conclusions are consistent with *Rayburn* and offer assistance to the analysis here.

¶ 103. In contrast, the majority cannot identify one opinion implementing the primary duties test as developed under *Rayburn,* and as applied by Wisconsin courts and a majority of other courts, that concludes that the ecclesiastical exception applies in a lay teacher/religious school context.[5] That is not surprising. As the principles stated in *Rayburn* show, courts have recognized that the point of the primary duties

---

[5] *Stately v. Indian Community School of Milwaukee, Inc.,* 351 F. Supp. 2d 858 (E.D. Wis. 2004), which is the only published case that appears to go the other way under the primary duties test, is of limited utility. In that case, the school in question taught Native American culture and practices to Native American children; it is not clear from that case the degree to which

test is to distinguish between employees of churches or religious organizations for whom employment decisions are likely to involve ecclesiastical decisions or matters of church governance, faith, and doctrine, and those other employees for whom such employment decisions are unlikely to implicate such matters. In other words, the ecclesiastical exception is intended to apply narrowly in situations where lay teachers assert claims alleging employment discrimination by a religious school employer.

¶ 104. Hence, given the facts in this case, I conclude, as did ALJ Brown, LIRC, the circuit court, and the court of appeals, that Ostlund does not fit within the ecclesiastical exception. As an initial matter, the focus of the primary duties test is, as its name indicates, the employee's duties, not the religious mission of the group, the school, or its teachers. To conclude otherwise would impermissibly broaden the ecclesiastical excep-

---

that school or the teacher taught secular subjects or was required to inculcate Native American culture and practices into those subjects.

Furthermore, one can easily distinguish the other published cases that the majority invokes for support for the case at hand. *See, e.g., EEOC v. Hosanna-Tabor Evangelical Lutheran Church & Sch.,* 582 F. Supp. 2d 881 (E.D. Mich. 2008) (ecclesiastical exception applied to a teacher designated "commissioned minister," as opposed to its non-titled lay teachers); *Pardue v. Ctr. City Consortium Sch. of the Archdiocese of Wash., Inc.,* 875 A.2d 669 (D.C. 2005) (determining that exception applied to elementary Catholic school principal). *Cf. Porth v. Roman Catholic Diocese of Kalamazoo,* 532 N.W.2d 195 (Mich. Ct. App. 1995) (refusing to allow state religious discrimination laws to apply to parochial schools). *But see Weishuhn v. Catholic Diocese of Lansing,* 756 N.W.2d 483 (Mich. Ct. App. 2008) (concluding that *Porth* is not controlling of question of whether ecclesiastical exception exists in Michigan).

334

tion, given that all sectarian schools are likely to identify a religious purpose that is integral to the particular religion's mission.

¶ 105. In addition, I conclude, as did the court of appeals, that Ostlund's duty to model and support Catholic values is not a distinguishing factor to be included within the primary duties test. Again, undoubtedly all sectarian schools ask many, if not all, of their employees to serve as models of particular values. That factor does not operate to distinguish between employees whose positions fit within the ecclesiastical exception and those whose positions do not.

¶ 106. Further, I am not persuaded that the facts here present a situation where the secular subjects taught by Ostlund are so infused with religious doctrine that that instruction can be characterized as teaching the faith in each secular subject. CCS uses non-religious textbooks for its secular classes; the isolated instances in which religious images and concepts crossed over into secular subjects—the "Christmas around the world" unit in social studies, the use of connect-the-dots religious images in math class, and the reading exercise using images from the Garden of Eden—cannot logically be said to "infuse" the first-graders' secular education with religious doctrine. Furthermore, I conclude, as did the court of appeals, that evaluations of Ostlund's job performance generally refer not to specific Catholic doctrine, but to moral qualities and values (such as honesty, fairness, and following rules) that are not exclusive to Catholicism.

¶ 107. Moreover, in light of the above conclusions, I reach a different result than the majority reaches when I apply the primary duties test to the undisputed facts here. Although Ostlund had religious duties as part of her job, those duties cannot be considered

335

"primary," which I use in both the quantitative and qualitative sense. The religion class, prayers, and participation in and planning of liturgies did not come close to making up a major portion of Ostlund's work day, nor was inculcating children with Catholic doctrine and practices a central focus of her job description or evaluation. Further, CCS did not require its teachers to be Catholic. We are aware, however, that Ostlund and other elementary school teachers were required to complete in-service religious training. I conclude, as did the court of appeals, that such information certainly is not enough to lead me to the conclusion that Ostlund's religious duties were her primary duties.[6]

¶ 108. Finally, the conclusion that Ostlund's circumstances do not satisfy the ecclesiastical exception is consistent with the underlying principle that the exception should be applied to quintessentially religious positions for which employment decisions are likely to implicate matters of religious canons, doctrines, or policies. In short, employment decisions involving Ostlund's position are unlikely to implicate matters of Catholic governance, faith, or doctrine. Thus, neither the First Amendment of the United States Constitution nor Article I, Section 18 of the Wisconsin Constitution

_____

[6] The court of appeals, in an effort to increase the utility of the primary duties test, adopted the school's "hiring criteria" as an additional factor to supplement the primary duties test, based on *Starkman v. Evans,* 198 F.3d 173, 176–77 (5th Cir. 1999). Because our review is limited to LIRC's decision, we need not decide whether evidence of such hiring criteria supplements the primary duties test. Moreover, evidence of an employer's hiring criteria or the individual's job description seemingly would be relevant to an analysis under the primary duties test as indicative of what the parties considered to be the primary duties.

operate, in this situation, to bar adjudication of Ostlund's discrimination claim. Hence, LIRC did not err in concluding as much.

¶ 109. Indeed, the majority and I appear to agree that a fair application of the primary duties test, as our courts and a majority of others have applied it, yields only one sensible result: that Ostlund's position is not "ecclesiastical." Yet rather than accept that result, the majority opts to gild the primary duties test with a functional analysis that produces a significantly broader approach, *see* majority op., ¶ 47, and to apply the facts selectively to that approach. I disagree with the majority's view for three primary reasons.

¶ 110. First, the majority, in advocating for its so-called functional analysis, fails to identify—nor can I point to—a principle in Wisconsin law justifying its adoption as an addendum that significantly alters the primary duties test.[7] More specifically, it fails to explain persuasively why this court should toss out the analysis that Wisconsin courts and a majority of other courts have been applying[8] and replace it with an approach that has little or no support from other jurisdictions

---

[7] The majority appears to support its reasoning in great part with the freedom of conscience clauses in Article I, Section 18 of the Wisconsin Constitution and those clauses' use of the "strongest possible" language to ensure autonomy for religious groups and individuals. Majority op., ¶ 59. However, it is worth noting that Article I, Section 18 uses identically strong language ("nor shall any person be compelled to attend, erect, or support a place of worship, or to maintain any ministry, without consent; nor shall . . . any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies . . . ") in describing its prohibitions against state advancement of religion.

[8] The majority appears to conflate the concept of de novo review of the application of constitutional principles to a given

and that appears to be merely a matter of preference for the majority. The majority furthermore uses its new test to reach a result that is an utter anomaly compared with the results reached by nearly every other court that has confronted a similar issue. Here, the majority extends the ecclesiastical exception, which has traditionally been reserved for ordained clergy and ministers, to a first-grade lay teacher at a Catholic school.

¶ 111. Second, what is of great concern is that the majority's overbroad and sweeping language implicates significantly far-reaching consequences beyond simply calling Ostlund "ecclesiastical" for purposes of applying the exception. As an initial matter, I cannot take comfort in the majority's assurances that its proposed analysis will be very fact-sensitive, majority op., ¶¶ 48–49, and that its holding is "not giving a blanket exception to all religious school teachers," *id.,* ¶ 84. CCS's mission is not unique among Catholic schools, and Ostlund's duties are not unique among lay Catholic

---

set of facts with the concept of overruling precedent. Majority op., ¶ 47 n.22. *Jocz* is a decision of the court of appeals, in which the court adopted the primary duties test. In *Cook v. Cook,* we stated, "[Wis. Stat. § 752.41(2)] provides that officially published opinions of the court of appeals shall have statewide precedential effect. Thus, the principle of stare decisis is applicable to the decisions of the court of appeals." *Cook v. Cook,* 208 Wis. 2d 166, 186, 560 N.W.2d 246 (1997) (citing Wis. Stat. § 752.41(2) (1995–96)). Therefore, while we of course review de novo the application of constitutional principles to the facts of this case, that concept in no way authorizes wholesale disregard of the principle of stare decisis. In other words, though we, in essence, "start over" in the analysis of the application of the law to this case, we do not "start over" with respect to determining whether the primary duties test is the right test unless we are prepared to undertake a full explanation of the reasons we are disregarding precedent. Otherwise, it is entirely appropriate to follow the approach in *Jocz.*

schoolteachers. If this case is to serve as an example of how a Catholic school infuses Catholic doctrine into every secular subject taught there, I fail to see how any lay Catholic schoolteacher will fall outside of this broad "exception" devised by the majority.

¶ 112. Third, and of greatest concern, as noted previously, while I recognize the majority's analysis under the First Amendment centers on the Free Exercise Clause, the majority's sweeping language and analysis nonetheless jeopardizes this court's long-standing decisions under the Establishment Clause of the United States Constitution, and under Article I, Section 18 of the Wisconsin Constitution. Specifically, thanks to the majority's opinion, the continued viability of *Jackson v. Benson,* which upheld the Milwaukee school choice program, is in grave danger.

¶ 113. In *Jackson v. Benson,* the central issue before our court was the constitutionality, under the Establishment Clause of the United States Constitution and Article I, Section 18 of the Wisconsin Constitution, of the amended Milwaukee Parental Choice Program (amended MPCP), a school choice program that enables children in low-income families to attend private schools through a voucher system. The participating schools in that program include both nonsectarian and sectarian schools. Significantly, the program also includes an "opt-out" provision that prohibits private schools from requiring children to participate in religious activities if their parents or guardians wish their children to be exempt from such activities. *Jackson,* 218 Wis. 2d at 849. The program also requires participating private schools to *comply with nondiscrimination laws. Id.* at 846–47. We ultimately concluded that the amended MPCP did not run afoul of either the Establishment Clause or Article I, Section 18. *Id.* at 875–76, 883–84.

¶ 114. Those features of the Milwaukee school choice program were not remarkably different from those in a Cleveland school voucher program in *Zelman v. Simmons-Harris,* 536 U.S. 639 (2002). Notably, compliance with nondiscrimination laws was also a requirement of the school choice program upheld by the United States Supreme Court in that case. The majority correctly states that in *Zelman,* the Court "found that the Cleveland [school voucher] program was neutral and a program of true private choice, and thus did not violate the Establishment Clause." Majority op., ¶ 74 n.29. However, the majority omits the fact that the United States Supreme Court expressly noted in that case that participating private schools were required by statute to comply with nondiscrimination laws. *Zelman,* 536 U.S. 639, 645 (citing to Ohio Rev. Code Ann. § 3313.976). In contrast, under the majority's overly broad interpretation of the ecclesiastical exception here, a participating private school may, in fact, disregard such nondiscrimination laws with impunity where lay teachers are concerned because no claim of discrimination—whether based on race, religion, ethnic background, or other forbidden grounds of discrimination—can be pursued.

¶ 115. I believe that the majority opinion, by its holdings, undermines our court's conclusions in *Jackson v. Benson* in multiple respects. First, as to our conclusion that the amended MPCP did not violate the Establishment Clause, the majority opinion here cannot be squared with our analyses in *Jackson v. Benson* under (a) the second prong of the *Lemon* test, under which we assessed whether the school choice program had a primary effect of advancing religion, and (b) the third prong of the *Lemon* test, under which we assessed whether the school choice program would result in excessive government entanglement. *See Lemon v.*

340

*Kurtzman,* 403 U.S. 602, 612–613 (1971). Second, as to our conclusion in *Jackson v. Benson* that the amended MPCP did not violate Article I, Section 18 of the Wisconsin Constitution, the majority opinion likewise runs counter to our analyses under both (a) the benefits clause and (b) the compelled support clause of that constitutional provision. Below, I revisit all four of those portions of our analysis in *Jackson v. Benson* and explain in detail why I believe the majority opinion here undermines those conclusions.

¶ 116. As an initial matter, as to our Establishment Clause[9] analysis in *Jackson v. Benson,* we applied the test first established in *Lemon.* In the context of a public benefit such as a school voucher program, that benefit does not run afoul of the Establishment Clause if (1) it has a secular legislative purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not create excessive entanglement between government and religion. *Jackson,* 218 Wis. 2d at 856 (citing *Lemon,* 403 U.S. at 612–13). Our analysis in *Jackson v. Benson* under the second prong of that test—whether the benefit in question has a principal or primary effect of neither advancing nor inhibiting religion—cannot be squared with the majority opinion here.

¶ 117. In assessing the constitutionality of the amended MPCP under the second prong of the *Lemon* test, we first explained that benefits under the amended MPCP needed to be "determined by 'neutral, secular criteria that neither favor nor disfavor religion,' and aid 'is made available to both religious and secular benefi-

_____

[9] The Establishment Clause to the First Amendment of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion . . . ."

ciaries on a nondiscriminatory basis.'" *Jackson,* 218
Wis. 2d at 869 (quoting *Agostini v. Felton,* 521 U.S. 203
(1997)). We observed that the criteria for selecting
schools eligible to participate in the program were
established on a religion-neutral basis—that is, both
sectarian and nonsectarian schools could participate in
the program. However, we also emphasized that the
"opt-out" provision, preventing religious private schools
from requiring students to participate in any religious
activity provided at the school, was a significant factor
in finding the amended MPCP did not have a primary
effect of advancing religion. *Jackson,* 218 Wis. 2d at
869–70. We further concluded that, because of those
features in the program, the amended MPCP "provides
a neutral benefit to beneficiaries selected on religious-
neutral criteria" and "neither leads to religious indoc-
trination, nor creates [a] financial incentive for stu-
dents to undertake a sectarian education." *Id.* at 871
(quotation marks and citations omitted; brackets in
*Jackson v. Benson*).

¶ 118. Yet, the majority in the instant case
reaches its conclusion by conflating selected evidence
that, taken together, creates the false impression that
the teaching of secular subjects at CCS is infused with
religion. For example, the majority particularly empha-
sizes the school's stated mission, which, as I observed
earlier, *see supra,* ¶ 102, does not differentiate at all
between ecclesiastical and non-ecclesiastical positions
at the school. *See, e.g.,* majority op., ¶ 5 ("The Catholic
school is considered a 'ministry' of the Catholic
Church. . . . [T]he Catholic Church considers 'the foun-
dation of the whole educational enterprise in a Catholic
school' to be Jesus Christ. The Catholic school aims at 'a
Christian concept of life centered on Jesus Christ.' ");
*id.,* ¶ 73 (citing CCS's mission to provide "a distinctly

Catholic education aimed at a 'Christian concept of life' "); *id.* ("[CCS] aims to be a worship-filled educational environment with a faith-centered approach to learning."). Likewise, the majority puts great weight on CCS's view that teachers should attempt to incorporate religious material into teaching secular subjects. *See id.,* ¶ 74 ("Teachers made efforts to integrate Catholic values into various aspects of the curricula," including the integration of "theological and moral principles into each subject, as well as the use of religious examples and symbols that would not be found in a public school.").

¶ 119. The majority then overgeneralizes the evidence of the school's actual practices, *see id.,* ¶ 77, to support its statements that CCS infuses the teaching of its subjects with religious doctrine where the actual evidence of faith-based instruction and activity is unremarkable for a Catholic or any other religious primary or secondary school. *See, e.g., id.* ¶¶ 7, 9 (evidence of incorporated religious examples and symbols and values into lessons included a unit on Christmas celebrations around the world in social studies, a reading exercise using objects in the Garden of Eden, and a math exercise connecting dots to form "religious images"); *id.* ¶¶ 6, 8 (Ostlund led students in prayer before school and after lunch); *id.,* ¶ 10 (Ostlund taught 30 minutes of religion three days a week and participated in school-wide recognition of several Catholic holidays); *id.,* ¶ 12 (the classroom had a prayer corner, crucifix, and other seasonal religious objects). Those instances of religious activity fuel the majority's conclusion that "it is obvious that Ostlund's role was of high importance and closely linked to the mission of the school—the inculcation of a Christ-centered concept of life." *Id.,* ¶ 76.

¶ 120. Put bluntly, the majority's conclusions here are based on facts that do not distinguish CCS's practices and Ostlund's duties from those of any other Catholic school or schoolteacher in Wisconsin, or, for that matter, from any other religious school and its approach toward education. If the majority is correct in its conclusions, I fail to see how it can continue to be maintained that benefits flowing from the Milwaukee school choice program do not have the primary effect of advancing religion. If indeed a Catholic school infuses religion into all of its subjects, including courses thought to be secular, as the majority claims, how can the jurisprudential reasoning of *Jackson v. Benson* survive the majority's holding in this case?

¶ 121. Further, we concluded in *Jackson v. Benson* that the amended MPCP does not create excessive entanglement between the state and religion under the third prong of the *Lemon* test. *See Lemon,* 403 U.S. at 613. Although that program requires participating schools to be subject to some state oversight, including the requirement that "[p]articipating private schools are subject to . . . *applicable nondiscrimination,* health, and safety obligations," *Jackson,* 218 Wis. 2d at 874 (emphasis added), we concluded that standard oversight activities, *such as the requirement to comply with nondiscrimination laws,* do not create excessive entanglement. Quoting *Hernandez v. Commissioner,* 490 U.S. 680, 696–97 (1989), we observed:

> [R]outine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no detailed monitoring and close administrative contact between secular and religious bodies, does not of itself violate the nonentanglement command.

*Jackson,* 218 Wis. 2d at 875.

344

¶ 122. Again, if it is unconstitutional for a court to adjudicate a claim for discrimination by a lay teacher against a Catholic school, as the majority holds here, surely the amended MPCP's provision requiring participating schools to comply with nondiscrimination laws must then also be unconstitutional.

¶ 123. Likewise, the majority's decision endangers our holding in *Jackson v. Benson* under the benefits clause in Article I, Section 18 of the Wisconsin Constitution. That clause, which is the Wisconsin equivalent of the federal Establishment Clause, provides: "nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries." *See Jackson,* 218 Wis. 2d at 876 n.20. Our inquiry under the benefits clause is identical to our analysis under the second prong of the *Lemon* test. *See id.* at 878 (the ultimate question under the benefits clause is "whether [a benefit's] primary effect advances religion" (citation omitted)). Additionally, our courts have treated that clause as such. *Compare State ex rel. Warren v. Nusbaum,* 64 Wis. 2d 314, 325, 219 N.W.2d 577 (1974) (*Nusbaum II*) (no violation of benefits clause where a state program subsidized special-needs children's attendance at sectarian private schools where the program chose students through a neutral process and the legislature went to "great lengths" to ensure "that the inculcation of religious tenets [did] not take place"), *with State ex rel. Weiss v. Dist. Bd.,* 76 Wis. 177, 44 N.W. 967 (1890) (public funds may not be used to fund a school that requires students to read from the Bible).

¶ 124. Thus, just as with the above analysis under the second prong of the *Lemon* test, the majority's characterization of facts that religion is central to every part of CCS's curriculum, *see, e.g.,* majority op., ¶¶ 5,

345

72, 73, 75–77, and, by extension, any other Catholic or otherwise religious school, likewise jeopardizes our holding in *Jackson v. Benson* that the amended MPCP does not violate the benefits clause in Article I, Section 18.

¶ 125. Finally, the majority's conclusion implicates our holding in *Jackson v. Benson* under the compelled support clause in Article I, Section 18 of the Wisconsin Constitution. That clause provides: "nor shall any person be compelled to attend, erect or support any place of worship." In upholding school choice, it was very significant to our court that the program prohibited "a sectarian private school from requiring students attending under the program to participate in religious activities offered at such school." *Jackson,* 218 Wis. 2d at 883. Hence, a query: If secular subjects at CCS are so infused with religion (*see* majority op., ¶¶ 5, 72, 73, 75–77), how does a student whose parents wish to exempt him or her from participation in religious activities escape inculcation? The answer to such a question, if the position of the majority is followed here, clearly jeopardizes our analysis of the constitutionality of the Milwaukee school choice program under the compelled support clause. I disagree with the majority, *see* majority op., ¶ 74 n.29, that the opt-out provision was not important to our holding in *Jackson v. Benson.*

¶ 126. In conclusion, I disagree with the majority's view that the primary duties test needs to be altered with its self-styled "functional analysis." The primary duties test is the test that Wisconsin courts and most other courts in the country have been applying. To the extent courts have applied that test to lay teachers at religious schools, the results have been consistent: The ecclesiastical exception is not intended to be applied to such

346

individuals. That result is consistent with the underlying rationale for the ecclesiastical exception and in no way implicates state interference with matters of religious polity or doctrine. Additionally, the majority fails to identify a compelling reason to change how Wisconsin courts have approached such cases. Finally, the majority's conclusion that, based on the facts here, CCS infuses its secular subjects with religion effectively extends a free pass to religious schools to violate nondiscrimination laws with regard to their lay employees; moreover, it undoubtedly threatens this court's decision in *Jackson v. Benson* and, consequently, the continued viability of the Milwaukee school choice program.

¶ 127. For those reasons, I respectfully dissent.

¶ 128. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissent.